# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**
**No. 20-1351V**
Filed: September 22, 2026

| | |
|---|---|
| DARLENE QUERIO, | * |
| Petitioner, | * |
| v. | * |
| SECRETARY OF HEALTH AND HUMAN SERVICES, | * |
| Respondent. | * |

*Anne Toale*, Mctlaw, Sarasota, FL, for Petitioner.
*Leslie Snider,* U.S. Department of Justice, Washington, DC, for Respondent.

## RULING ON ENTITLEMENT[1]

**Shah**, Special Master:

On October 9, 2020, Darlene Querio ("Petitioner" or "Ms. Querio") filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. § 300aa-10, *et seq*.[2] (the "Vaccine Act" or "Program"), alleging that she suffered from Guillain-Barré syndrome ("GBS") as a result of the influenza ("flu") vaccine she received on October 23, 2017. Pet. at 2.

[1] Because this Ruling contains a reasoned explanation for the action in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Ruling will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all "§" references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

I conclude Petitioner's case met the elements of the Table injury of GBS following flu vaccination. Further, Respondent did not preponderantly prove that a "factor unrelated" to her vaccination, specifically a *Haemophilus influenzae* ("*H. influenzae*") infection, was the sole substantial cause of her GBS. Accordingly, Petitioner is entitled to compensation.

## I. PROCEDURAL HISTORY

Petitioner filed the petition on October 9, 2020. She filed various medical records and an affidavit on October 23, 2020, and February 9, 2021. ECF Nos. 6-7, 12.

On February 10, 2021, this case was reassigned to former Special Master Katherine E. Oler. ECF No. 14. On October 17, 2021, Special Master Oler held a status conference, at which Respondent advised that Petitioner's case satisfied the elements of a Table flu/GBS claim, but Respondent intended to establish an alternate cause was responsible for her injury. *See* Scheduling Order issued 2/19/2021. Special Master Oler believed there was litigative risk on both sides and encouraged settlement negotiations. *See id.* On March 18, 2021, Respondent filed a status report maintaining his intent to defend the case. ECF No. 16.

On July 16, 2021, Respondent filed an expert report from Kathleen Collins, M.D., Ph.D., along with her CV and supporting medical literature. ECF No. 21. Petitioner filed additional medical records and an expert report and CV from Sami Khella, M.D., on October 11, 2022. ECF Nos. 30, 31. On February 6, 2023, Respondent filed a second report from Dr. Collins. ECF No. 33.

Special Master Oler set a deadline for Petitioner to file a supplemental expert report. Instead, Petitioner filed a "Motion to Close Record and Set Briefing Schedule," stating that she did not believe a second report was necessary and proposing a briefing schedule for a ruling on the record. ECF No. 36. Former Special Master Oler granted Petitioner's motion. *See* Non-PDF Scheduling Order dated 8/18/2023.

Petitioner filed additional medical records on October 11, 2023. ECF No. 37. On October 23, 2023, Petitioner filed a Motion for Findings of Fact and Conclusions of Law ("Motion"). ECF No. 39. On January 9, 2024, Respondent filed a response to the Motion ("Response") and a Rule 4(c) Report. ECF No. 41. Petitioner filed a reply on February 15, 2024 ("Reply"). ECF No. 43. The parties filed a joint status report confirming the record was complete on March 5, 2024. ECF No. 45. Petitioner filed updated medical records on March 5, 2024, December 3, 2024, September 8, 2025, and March 25, 2026. ECF No. 44, 47, 48, 49.

On August 13, 2024, this case was reassigned to my docket. ECF No. 46. The case is now ripe for adjudication.

## II. FACT EVIDENCE

### A. Medical Records

Petitioner was 60 years old at the time of the subject vaccination on October 23, 2017. Ex. 1 at 2. Her prior medical history included hypertension, gastroesophageal reflux disease, obesity, degenerative joint disease with a left knee replacement, breast cancer with surgery and radiation therapy, gastric bypass surgery, and a bladder sling. Ex. 3 at 29-31; Ex. 4 at 12-13; Ex. 7 at 4792-93; Ex. 9 at 40; Ex. 10 at 139-40, 197-99, 410-11. She used a walker to ambulate at home. Ex. 12 at 32.

On October 23, 2017, Petitioner received a flu vaccination at a local CVS. Ex. 1 at 2. She had previously received flu vaccinations in 2007, 2008, 2009, 2010, and 2013. Ex. 3 at 29. On November 3, 2017, she went to the ER, complaining of bilateral leg weakness that began that morning. Ex. 7 at 5250. She reported she had a "productive cough" over the past week. *Id.* The previous day, she began vomiting and had little oral intake. *Id.* On exam, she had an oxygen saturation level of 86%. *Id.* at 5251. She had 5/5 strength with plantarflexion, dorsiflexion, knee flexion, and knee extension, but she had only 1/5 strength with hip flexion and bilateral extension. *Id.* at 5250. She had a chest x-ray that showed pulmonary vascular congestion. *Id.* at 5256. Bloodwork revealed an elevated white blood cell ("WBC") count of 15.7 (reference range 4.5-11), along with an elevated absolute neutrophil count of 13.9 (reference range 1-8). Ex. 7 at 40, 5254. Petitioner was started on Tamiflu and IV antibiotics and admitted to the ICU. *Id.* at 796, 826, 5413.

On November 4, 2017, Petitioner was intubated due to ongoing respiratory issues and aspirated while she was intubated. Ex. 7 at 2409. Petitioner's doctors performed a bronchoscopy to confirm that she aspirated. *Id.* at 2354. A sample from the bronchoscopy was cultured and was positive for *H. influenzae* bacteria. *Id.* at 216. The culture also revealed numerous WBCs, numerous Gram negative rods, and a few Gram positive cocci. *Id.* She also had positive IgG and IgM results for influenza A and B. *Id.* at 278-79. Petitioner was started on an additional antibiotic, Levaquin. *Id.* at 945.

Petitioner's treating physicians suspected GBS but could not perform a confirmatory lumbar puncture due to her intubation and obesity. Ex. 7 at 4023. They started her on IVIG to treat presumptive GBS, which improved her condition. *Id.* at 4023, 4030. She was transferred out of the ICU on November 23, 2017. *Id.* at 4030, 4035. Her diagnosis included severe hypoxia from *H. influenzae* pneumonia and possible GBS. *Id.* at 4033.

Petitioner was discharged to inpatient pulmonary rehabilitation on December 11, 2017. Ex. 7 at 5421. The discharge summary stated she was intubated due to "respiratory failure secondary to *H. influenzae* pneumonia." *Id.* at 5413.

The intake summary at the rehabilitation facility noted that Petitioner was found to be hypoxic in the ER, was started on oxygen, continued to desaturate, and ultimately required intubation. Ex. 12 at 32. She had the flu vaccine two to three weeks before her admission and developed flu-like symptoms a few days after being vaccinated. *Id.* She then developed distal

muscle weakness that progressed proximally, leading to a diagnosis of GBS and the initiation of IVIG. *Id.* She also had a sputum culture that was positive for mycobacterial infection and *H. influenzae*. *Id.*

While Petitioner was in rehabilitation, she underwent an electrodiagnostic study that showed severe peripheral axonal polyneuropathy consistent with GBS. Ex. 12 at 718. On December 14, 2017, she had a follow-up chest CT that showed findings consistent with multifocal pneumonia. Ex. 10at 47. When she had a repeat chest CT on March 29, 2018, she still had "[r]esolved pneumonic infiltrates with residual scarring/subsegmental atelectasis,[3]" as well as pulmonary hypertension. *Id.* at 39. She remained in rehabilitation until November 2018. Ex. 11 at 11.

On July 9, 2019, Petitioner presented to neurology resident, Janae Dupuis, M.D., and attending Ann Little, M.D., at the University of Michigan. Ex. 11 at 11. The history, derived from Petitioner and the electronic medical record, stated:

> On 10/20/17 she received her flu shot. Over the next few days she remembers feeling generally unwell. Then on 11/1/17 she developed tingling of hands and feet. By the following day her hands and feet were numb. She doesn't remember the following events but her husband reports that by 11/3/19 she had rapidly ascending weakness and was completely unable to move from the neck down. She was admitted [to] Genesy Hospital and intubated shortly after arrival. She remained intubated for several weeks and ultimately needed a tracheostomy. She had significant autonomic instability during this time. Her hospital course was further complicated by HCAP [hospital acquired pneumonia]. We were unable to find records but her husband reports she had an EMG that showed nerve damage. A LP was never done. On day 10 of her hospitalization she received IVIG.

The physicians characterized her condition as monophasic. *Id.* at 14.

## III. <u>EXPERT EVIDENCE</u>

### A. Respondent's Expert Kathleen Collins, M.D., Ph.D..: First Expert Report

Dr. Collins earned her M.D. and Ph.D. from Johns Hopkins University in 1993. Ex. B ("Collins CV") at 1. She completed her residency in internal medicine in 1995 and clinical and research fellowships in infectious disease from 1995-1998. *Id.* Since 1998, she has held clinical and academic professorships at the University of Michigan in internal medicine and microbiology

---

[3] Atelectasis: 1. incomplete expansion of a lung or a portion of a lung; it may be a primary (congenital), secondary, or otherwise acquired condition. 2. airlessness or collapse of a lung that had once been expanded. DORLAND'S MEDICAL DICTIONARY ONLINE ("DORLAND'S"), https://www.dorlandsonline.com/dorland/definition?id=4646 (last accessed on September 21, 2026).

and immunology. *Id.* She is the recipient of numerous research grants. *Id.* at 3-6. She has authored or co-authored 40 peer-reviewed journal articles and five book chapters, with a particular focus on immunology and HIV. *Id.* at 14-20.

Reviewing Petitioner's medical course, Dr. Collins opined that Petitioner's lab work in the hospital revealed conclusive evidence she was suffering from *H. influenzae* bacterial infection in her lungs. Ex. A ("First Collins Rep.") at 3. That conclusion was supported by her chest CT, which showed multifocal "ground glass" opacities in her lungs. *Id.* Although the interpreting radiologist commented that these findings could be caused by atelectasis, they were also consistent with an infectious process. *Id.* Additionally, Petitioner had an elevated WBC count and a shift of WBC count towards production of neutrophils, indicative of infection. *Id.* Petitioner also had hypoxia early in her course and before the development of severe weakness, suggesting that her "lungs were functionally impaired by this infection." *Id.* She was treated with broad spectrum antibiotics, reflecting her treating team's belief that she was suffering from an infectious lung process. *Id.*

Dr. Collins noted that Petitioner had positive IgG and IgM results for influenza A and B. First Collins Rep. at 3-4. In her view, these results indicated remote exposure consistent with the flu vaccination she received on October 23, 2017. *Id.* at 4.

Dr. Collins did not dispute Petitioner's diagnosis of GBS. She concluded, however, that Petitioner's GBS was not likely caused by her October 23, 2017 flu vaccination. First Collins Rep. at 5. First, the current scientific evidence does not support the claim that the seasonal flu vaccine can cause GBS. *Id.* Second, her infection with *H. influenzae* was a more likely cause of her GBS. *Id.* at 11.

Dr. Collins cited a series of epidemiologic studies. First Collins Rep. at 6. *Stowe* used a self-controlled case series ("SCCS") model to compare the risk of GBS at several time points following seasonal flu vaccination. *Id.* (citing Julia Stowe et al., *Investigation of the Temporal Association of Guillain-Barré Syndrome With Influenza Vaccine and Influenzalike Illness Using the United Kingdom General Practice Research Database*, 169 AM. J. EPIDEMIOLOGY 382-88 (2008) (Ex. A, Tab 3) ("*Stowe*"). There was no increased risk of GBS in the first 90 days following vaccination. *Id.* By contrast, there was a markedly increased risk of GBS within the first 90 days after influenza infection. *Id.* Similarly, *Grimaldi-Bensouda* reported an association between flu infection (or infection with flu-like symptoms) and GBS, but no association between the flu vaccine and GBS. *Id.* (citing Lamiae Grimaldi-Bensouda et al., *Guillain-Barré Syndrome, Influenza-like Illnesses, and Influenza Vaccination During Seasons With and Without Circulating A/H1N1 Viruses*, 174 AM. J. EPIDEMIOLOGY 326-35 (2011) (Ex. A, Tab 4) ("*Grimaldi-Bensouda*")). Also, *Greene* found that the 2009 and 2010 seasonal flu vaccines did not pose an elevated risk of GBS. *Id.* (citing Sharon Greene et al., *Guillain-Barré Syndrome, Influenza Vaccination, and Antecedent Respiratory and Gastrointestinal Infections: A Case-Centered Analysis in the Vaccine Safety Datalink, 2009-2011*, 8 PLOS One 1-10 (2013) (Ex. A, Tab 1) ("*Greene*")). The *Vellozzi* study reported a lower risk of GBS following H1N1 influenza vaccination than in unvaccinated populations. *Id.* at 8 (citing Claudia Vellozzi et al., *Cumulative Risk of Guillain-Barré Syndrome Among Vaccinated and Unvaccinated Populations During the 2009 H1N1 Influenza Pandemic*, 104(4) AM. J. PUB. HEALTH 696-701 (2014) (Ex. A, Tab 5)

(“*Vellozzi I*”)). Finally, the *Baxter* study found no evidence of increased risk of GBS following any type of vaccination, including flu. *Id.* (citing Roger Baxter et al., *Lack of Association of Guillain-Barré Syndrome With Vaccinations*, 57(2) CLIN INFECT DIS 197-204 (2013) (Ex. A, Tab 8) (“*Baxter*”)).

Dr. Collins pointed out that infections, particularly infection with *Campylobacter jejuni* (“*C. jejuni*), are “strongly associated” with GBS. First Collins Rep. at 8 (citing Jeremy Rees et al., *Camplocacter Jejuni Infection and Guillain-Barré Syndrome*, 333(21) NEW ENG J MED 1374-79 (1995) (Ex. A, Tab 9) (“*Rees*”); Clarence Tam et al., *Guillain-Barré Syndrome and Preceding Infection with Campylobacter, Influenza and Epstein-Barr Virus in the General Practicfe Research Database*, 4 PLOS ONE e344 1-6 (2007) (Ex. A, Tab 2) (“*Tam*”). GBS caused by *C. jejuni* infection is believed to result from molecular mimicry between the peripheral nerve GM1 and the lipooligosaccharide coat of the *C. jejuni* bacterium. *Id.* at 9. Other infections have been associated with GBS as well. *Tam* found an association between GBS and a variety of infections in the previous two months, including “influenza-like illness” and “acute respiratory infection.” *Id.* at 9-10 (citing *Tam*). Flu vaccination was found to have a protective effect against GBS. *Id.* *Nafissi* had similar results and also found GBS patients had a higher rate of positive IgG antibodies for *H. influenzae* than controls. *Id.* at 10 (citing Shahriar Nafissi et al., *The Role of Cytomegalovirus, Haemophilus Influenzae and Epstein Barr Virus in Guillain Barre Syndrome*, 51(6) ACTA MED IRAN 372-76 (2013) (Ex. A, Tab 18) (“*Nafissi*”)). *Mori* and *Ju* also found significantly increased *H. influenzae* antibodies in GBS cases versus controls, suggesting a possible association between *H. influenzae* infection and GBS. *Id.* (citing Masahiro Mori et al., *Haemophilus influenzae infection and Guillain-Barré syndrome*, 123 BRAIN 2171-78 (2000) (Ex. A, Tab 17) (“*Mori*”); Y.Y. Ju et al., *Haemophilus influenzae as a possible cause of Guillain-Barré syndrome*, 149 J NEUROIMMUNOL 160-66 (2004) (Ex. A, Tab 16) (“*Ju*”)).

Dr. Collins noted that Petitioner developed an acute respiratory infection one week before onset of her GBS symptoms, and she had an elevated WBC count, abnormal chest CT, and positive culture for *H. influenzae* bacteria in the hospital. First Collins Rep. at 11. Based on Petitioner’s course and the epidemiologic data described above, Dr. Collins concluded that it was more likely that Petitioner’s GBS was caused by *H. influenzae* infection than by her flu vaccination. *Id.*

### B. Petitioner’s Expert Sami Khella, M.D.: Expert Report

Dr. Khella earned his M.D. from the University of Pennsylvania. Ex. 23 (“Khella CV”) at 1. He completed his neurology residency and muscular dystrophy fellowship at the University of Pennsylvania Hospital. *Id.* at 1-2. He currently serves as the director of clinical neurophysiology at the Penn Presbyterian Medical Center and as a professor of clinical neurology at the University of Pennsylvania School of Medicine. *Id.* He serves as an ad hoc reviewer for several publications, including *Neurology*, *Internal Medicine*, *Vaccines*, and the *Cleveland Clinic Journal of Medicine*. *Id.* at 3. He focuses his research on myasthenia gravis. *Id.* at 7-8. He has published approximately 30 peer-reviewed papers. *Id.* at 8-10. He is board certified in neurology, electrodiagnostic medicine, and clinical neurophysiology. *Id.* at 1.

Dr. Khella critiqued the studies cited by Dr. Collins. He argued that, although *Stowe* did not find a statistically significant increased risk of GBS following flu vaccination, the study was

relatively small and did not eliminate the possibility of such a risk. Khella Rep. at 2. He stated: "A larger sample size likely would have allowed a narrower confidence interval, *i.e.* a smaller margin of error and therefore a more informative result." *Id.* He also noted that the study found a higher relative incidence of GBS following flu vaccination than following pneumococcal vaccination. *Id.* The study used a 90-day risk interval instead of the more commonly accepted 42-day interval, which could have skewed the results against a finding of increased risk. *Id.* at 3. Further, the study measured risk in patients with "influenzalike illness," a vague term that could have captured people without any true infectious illness and also did not specifically capture patients infected with *H. influenzae*. *Id.*

Dr. Khella pointed out that *Grimaldi-Bensouda* found a statistical association between flu vaccination generally and GBS, with the seasonal flu vaccine likely driving that result. Khella Rep. at 3. This study was also very small and likely underpowered. *Id.* at 4. Dr. Khella contended that *Grimaldi-Bensouda* confirmed an association between flu infection and GBS but did not provide any meaningful data on the risk of GBS following flu vaccination. *Id.* "If anything, the actual statistical results *support* a link between seasonal flu immunization and GBS." *Id.*

*Greene* reported that GBS was statistically associated with vaccination generally. Khella Rep. at 4. Dr. Khella characterized this as a "meaningful association," noting that "[f]inding[s] like these are the reason I and other clinical neurologists often note any recent flu vaccination in a new GBS patient's medical history." *Id.* Further, the authors' adjustment for antecedent infection only resulted in a modestly different result. *Id.* "If anything, the modest effect of adjustment for antecedent infection strengthens the conclusion that flu vaccination and GBS are in fact causally associated." *Id.* Furthermore, *Greene* was also underpowered, and the authors did not define a p-value threshold for statistical significance. *Id.* at 5. Dr. Khella disagreed with Dr. Collins's comment that because the 2009 monovalent flu vaccination's administration coincided with the peak of flu infection, but the 2010-11 trivalent flu vaccination's administration did not, the increased risk of GBS must have been driven by infection rates, not vaccination. *Id.* He stated that this was a "sweeping conclusion to draw based on the existence or absence of rough correlations." *Id.* at 5-6.

Dr. Khella commented that a literature review by *Vellozzi* recognized the importance of sample sizes in studying vaccine-caused GBS. Khella Rep. at 6, citing Claudia Vellozzi et al., *Guillain-Barré Syndrome, Influenza, and Influenza Vaccination: The Epidemiologic Evidence*, 58(8) CLIN INFECT DIS 1149-55 (2014) (Ex. A, Tab 7) ("*Vellozzi II*"). The authors further acknowledged that "most studies of GBS secondary to flu vaccination have not been adequately powered to produce significant findings[.]" *Id.*

Although Dr. Khella did not dispute the results of studies finding an association between GBS and *H. influenzae* infection, he argued those studies "all involve[d] very small sample sizes and should accordingly be interpreted with extreme caution." Khella Rep. at 6 n.4. He did not dispute that "GBS secondary to infection can occur." *Id.* Similarly, he conceded that some studies have shown a protective effect of flu vaccination against GBS, likely because of protection against infection, but he maintained that was "not inconsistent with the fact that vaccination itself directly causes GBS in some cases." *Id.* at 6.

Dr. Khella described other studies finding a positive association between flu vaccination and GBS. Khella Rep. at 7. He explained that *Juurlink* found a relative risk of 1.45 for GBS following flu vaccination. *Id.* (citing David Juurlink et al., *Guillain-Barré Syndrome After Influenza Vaccination in Adults*, 166 ARCH INTERN MED 2217-21 (2006) (Ex. 24) ("*Juurlink*")). That study used a larger sample size than the studies cited by Dr. Collins. *Id.* *Lasky* found a relative risk of 1.7 for GBS after flu vaccination when the data from two flu seasons were combined. *Id.* (citing Tamar Lasky et al., *The Guillain-Barré Syndrome and the 1992-1992 and 1993-1994 Influenza Vaccines*, 339(25) NEW ENG J MED 1797-1802 (1998) (Ex. 25) ("*Lasky*")). The authors commented that their finding could underestimate the true risk of GBS after flu vaccination. *Id.* at 7-8. Lastly, *Kwong* evaluated a large sample of 2,831 GBS cases, finding a relative risk of 1.52 in the six weeks after vaccination. *Id.* at 8 (citing Jeffrey Kwong et al., *Risk of Guillain-Barré syndrome after seasonal influenza vaccination and influenza health-care encounters: a self-controlled study*, 13 LANCET INFECT DIS 769-76 (2013) (Ex. 26) ("*Kwong*")). The highest risk was two to three weeks after vaccination, consistent with Petitioner's presentation. *Id.* He concluded: "Overall, the literature clearly shows an association between flu vaccination and GBS." *Id.*

Dr. Khella opined that the flu vaccine was a more likely cause of Petitioner's GBS than the *H. influenzae* infection. Khella Rep. at 9. Her respiratory symptoms in the week before she was hospitalized were nonspecific and did not "mean she was infected with a pathogen known to trigger GBS, or even that she had an infection at all." *Id.* It is impossible to determine when she was infected with *H. influenzae*; that could have occurred at or after the time of her GBS symptom onset. *Id.* *H. influenzae* can be acquired in the hospital. *Id.* By contrast, Petitioner's vaccination date was known, and the onset of her GBS symptoms occurred in the expected timeframe after vaccination. *Id.*

### C. Dr. Collins's Second Report

Dr. Collins maintained her position that Petitioner's "infection was more likely than not the cause of her [GBS]." Second Collins Rep. at 1. She argued the *Stowe* study was sufficiently powered to "make the conclusions stated by the authors." *Id.* She claimed Dr. Khella misunderstood the significance of the study's finding that the pneumococcal vaccine was more protective than the flu vaccine against GBS. *Id.* at 1-2. *Stowe* did not show the flu vaccine was more likely to cause GBS than the pneumococcal vaccine, as Dr. Khella argued. *Id.* at 2. Furthermore, the difference between the vaccines was not statistically significant. *Id.*

*Stowe* measured a variety of time ranges following vaccination. Second Collins Rep. at 2. In the initial 30-day period, there was a "striking" difference between the risk of GBS following infection versus vaccination. *Id.* The study's identification of patients with an "influenza-like illness" was based on physician consultations, not self reporting, and used an official diagnosis code. *Id.* Thus, the study's findings were reliable. *Id.*

Dr. Collins disputed Dr. Khella's critiques of *Grimaldi-Bensouda* and *Greene*, arguing that he neglected to mention the small increased risks identified in those studies were not statistically significant. Second Collins Rep. at 3. By contrast, in *Greene*, the relative risk of GBS following infection was statistically significant. *Id.* Dr. Collins maintained that, adjusting for prior

infections, *Greene* found no increased risk of GBS following either the 2010-11 trivalent H1N1 vaccine or the 2009-10 monovalent vaccine. *Id.* Other studies that found an increased risk associated with the vaccine did not adjust for the timing of the flu season, confounding the results. *Id.*

Dr. Collins contended that *Vellozzi I* confirmed the protective effect of H1N1 flu vaccination against GBS by reducing infections. Second Collins Rep. at 3. The study found lower risk of GBS in vaccinated patients than unvaccinated patients. *Id.* at 3-4. She critiqued the 2006 *Juurlink* and 1998 *Lasky* studies for failing to adjust for infection in analyzing the risk of GBS after flu vaccination. *Id.* at 4. *Kwong* likely underestimated the risk of GBS following flu infections, as it studied only patients who received medical attention and thus did not account for those that had milder infections. *Id.* Dr. Collins surmised that flu-infected patients who do not seek care and develop GBS "may well account for any low risk that continues to be attributed to vaccination." *Id.* at 5.

On prong two, Dr. Collins noted that Petitioner had received numerous flu vaccinations with no problems before the subject vaccination. Second Collins Rep. at 5. She had symptoms of an upper respiratory illness for one week before her hospitalization, with one day of vomiting and little oral intake. *Id.* She had an elevated WBC count and an elevated absolute neutrophil count, as well as an abnormal CT angiogram on the day of admission. *Id.* *H. influenzae* is more likely to be contracted in the community than in the hospital. *Id.* The infection has an incubation period before the manifestation of clinical symptoms. *Id.* All of these factors indicate Petitioner acquired an *H. influenzae* infection before the onset of her GBS symptoms. *Id.* The timing of her respiratory symptoms was "consistent with the literature as being able to trigger [GBS]." *Id.*

Dr. Collins pointed out that Dr. Khella did not refute the studies showing an increased risk of GBS following infection generally and *H. influenzae* infection specifically. Second Collins Rep. at 5-6 (citing *Nafissi*, *Tam*, *Mori*, *Ju*). She concluded: "The evidence provided by Dr. Khella citing possible extremely low risk of [GBS] following vaccination does not change my assessment that it is more likely than not that [Petitioner's GBS] was not caused by flu vaccination." *Id.* Instead, the evidence shows that "an acute respiratory infection such as that caused by [*H. influenzae*] was more likely than not the cause[.]" *Id.*

## IV. <u>LEGAL FRAMEWORK</u>

### A. Petitioner's General Burden

Under the Vaccine Act, a petitioner may prevail in one of two ways. First, a petitioner may demonstrate that she suffered a "Table" injury—i.e., an injury listed on the Vaccine Injury Table that occurred within the time period provided in the Table. § 11(c)(1)(C)(i). "In such a case, causation is presumed." *Capizzano v. Sec'y of Health & Hum. Servs.*, 440 F.3d 1317, 1320 (Fed. Cir. 2006); *see* § 13(a)(1)(B). Second, where the alleged injury is not listed in the Vaccine Injury Table, a petitioner may demonstrate that she suffered an "off-Table" injury. § 11(c)(1)(C)(ii).

For both Table and non-Table claims, Vaccine Program petitioners bear a "preponderance of the evidence" burden of proof. Section 13(1)(a). That is, a petitioner must offer evidence that

leads the "trier of fact to believe that the existence of a fact is more probable than its nonexistence before [he] may find in favor of the party who has the burden to persuade the judge of the fact's existence." *Moberly v. Sec'y of Health & Hum. Servs.*, 592 F.3d 1315, 1324 (Fed. Cir. 2010); *see also Snowbank Enter. v. United States*, 6 Cl. Ct. 476, 486 (1984) (mere conjecture or speculation is insufficient under a preponderance standard). Proof of medical certainty is not required. *Bunting v. Sec'y of Health & Hum. Servs., 931 F.2d 867, 873* (Fed. Cir. 1991). In particular, a petitioner must demonstrate that the vaccine was "not only [the] but-for cause of the injury but also a substantial factor in bringing about the injury." *Moberly*, 592 F.3d at 1321 (quoting *Shyface v. Sec'y of Health & Hum. Servs.*, 165 F.3d 1344, 1352 (Fed. Cir. 1999)); *Pafford v. Sec'y of Health & Hum. Servs.*, 451 F.3d 1352, 1355 (Fed. Cir. 2006). A petitioner may not receive a Vaccine Program award based solely on his assertions; rather, the petition must be supported by either medical records or by the opinion of a competent physician. Section 13(a)(1).

In attempting to establish entitlement to a Vaccine Program award of compensation for a non-Table claim, a petitioner must satisfy all three of the elements established by the Federal Circuit in *Althen*. *Althen* requires that petitioner establish by preponderant evidence that the vaccinations he received caused her injury "by providing: (1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of a proximate temporal relationship between vaccination and injury." *Id.* at 1278.

Each of the *Althen* prongs requires a different showing. Under *Althen* prong one, petitioners must provide a "reputable medical theory," demonstrating that the vaccine received *can cause* the type of injury alleged. *Pafford*, 451 F.3d at 1355-56 (citations omitted). To satisfy this prong, a petitioner's theory must be based on a "sound and reliable medical or scientific explanation." *Knudsen v. Sec'y of Health & Hum. Servs.*, 35 F.3d 543, 548 (Fed. Cir. 1994). Such a theory must only be "legally probable, not medically or scientifically certain." *Id.* at 549.

The first *Althen* prong may be satisfied without resort to medical literature, epidemiological studies, demonstration of a specific mechanism, or a generally accepted medical theory. *Andreu v. Sec'y of Health & Hum. Servs.*, 569 F.3d 1367, 1378-79 (Fed. Cir. 2009) (citing *Capizzano*, 440 F.3d at 1325-26). Special Masters, despite their expertise, are not empowered by statute to conclusively resolve what are complex scientific and medical questions, and thus scientific evidence offered to establish *Althen* prong one is viewed "not through the lens of the laboratorian, but instead from the vantage point of the Vaccine Act's preponderant evidence standard." *Id.* at 1380. Accordingly, special masters must take care not to increase the burden placed on petitioners in offering a scientific theory linking vaccine to injury. *Contreras v. Sec'y of Health & Hum. Servs.*, 121 Fed. Cl. 230, 245 (2015) ("[p]lausibility … in many cases may be enough to satisfy *Althen* prong one" (emphasis in original)), *vacated on other grounds*, 844 F.3d 1363 (Fed. Cir. 2017). But this does not negate or reduce a petitioner's ultimate burden to establish her overall entitlement to damages by preponderant evidence. *W.C. v. Sec'y of Health & Hum. Servs.*, 704 F.3d 1352, 1356 (Fed. Cir. 2013) (citations omitted).

The second *Althen* prong requires proof of a logical sequence of cause and effect, usually supported by facts derived from a petitioner's medical records. *Althen*, 418 F.3d at 1278; *Andreu*, 569 F.3d at 1375-77; *Capizzano*, 440 F.3d at 1326 ("medical records and medical opinion

testimony are favored in vaccine cases, as treating physicians are likely to be in the best position to determine whether a 'logical sequence of cause and effect show[s] that the vaccination was the reason for the injury'") (quoting *Althen*, 418 F.3d at 1280). Medical records are generally viewed as particularly trustworthy evidence, because they are created contemporaneously with the treatment of the patient. *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

However, medical records and/or statements of a treating physician's views do not *per se* bind the special master to adopt the conclusions of such an individual, even if they must be considered and carefully evaluated. Section 13(b)(1) (providing that "[a]ny such diagnosis, conclusion, judgment, test result, report, or summary shall not be binding on the special master or court"); *Snyder v. Sec'y of Health & Hum. Servs*., 88 Fed. Cl. 706, 746 n.67 (2009) ("there is nothing … that mandates that the testimony of a treating physician is sacrosanct -- that it must be accepted in its entirety and cannot be rebutted"). As with expert testimony offered to establish a theory of causation, the opinions or diagnoses of treating physicians are only as trustworthy as the reasonableness of their suppositions or bases. The views of treating physicians should also be weighed against other, contrary evidence also present in the record -- including conflicting opinions among such individuals. *Hibbard v. Sec'y of Health & Hum. Servs*., 100 Fed. Cl. 742, 749 (2011) (not arbitrary or capricious for special master to weigh competing treating physicians' conclusions against each other), *aff'd*, 698 F.3d 1355 (Fed. Cir. 2012); *Caves v. Sec'y of Health & Hum. Servs*., No. 06-522V 2011 WL 1935813 at *17 (Fed. Cl. Spec. Mstr. Apr. 29, 2011), *mot. for review den'd*, 100 Fed. Cl. 344, 356 (2011), *aff'd without op.*, 475 Fed. App'x 765 (Fed. Cir. 2012).

The third *Althen* prong requires establishing a "proximate temporal relationship" between the vaccination and the injury alleged. *Althen*, 418 F.3d at 1281. That term has been equated to the phrase "medically-acceptable temporal relationship." *Id.* A petitioner must offer "preponderant proof that the onset of symptoms occurred within a timeframe which, given the medical understanding of the disorder's etiology, it is medically acceptable to infer causation." *de Bazan v. Sec'y of Health & Hum. Servs*., 539 F.3d 1347, 1352 (Fed. Cir. 2008). The explanation for what is a medically acceptable timeframe must also coincide with the theory of how the relevant vaccine can cause an injury (*Althen* prong one's requirement). *Id.* at 1352; *Shapiro v. Sec'y of Health & Hum. Servs*., 101 Fed. Cl. 532, 542 (2011), *recons. denied after remand on other grounds*, 105 Fed. Cl. 353 (2012), *aff'd without op.,* 503 F. App'x 952 (Fed. Cir. 2013). *Koehn v. Sec'y of Health & Hum. Servs*., No. 11-355V, 2013 WL 3214877 (Fed. Cl. Spec. Mstr. May 30, 2013), *mot. for review den'd* (Fed. Cl. Dec. 3, 2013), *aff'd*, 773 F.3d 1239 (Fed. Cir. 2014).

### B. Law Governing Analysis of Fact Evidence

The process for making factual determinations in Vaccine Program cases begins with analyzing the medical records, which are required to be filed with the petition. Section 11(c)(2). The special master is required to consider "all [] relevant medical and scientific evidence contained in the record," including "any diagnosis, conclusion, medical judgment, or autopsy or coroner's report which is contained in the record regarding the nature, causation, and aggravation of the petitioner's illness, disability, injury, condition, or death," as well as the "results of any diagnostic or evaluative test which are contained in the record and the summaries and conclusions." Section

13(b)(1)(A). The special master is then required to weigh the evidence presented, including contemporaneous medical records and testimony. *See Burns v. Sec'y of Health & Hum. Servs*., 3 F.3d 413, 417 (Fed. Cir. 1993) (it is within the special master's discretion to determine whether to afford greater weight to contemporaneous medical records than to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is evidenced by a rational determination).

Medical records created contemporaneously with the events they describe are generally trustworthy because they "contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions," where "accuracy has an extra premium." *Kirby v. Sec'y of Health & Hum. Servs.*, 997 F.3d 1378 (Fed. Cir. 2021) citing *Cucuras*, 993 F.2d at 1528. This presumption is based on the linked proposition that (i) sick people visit medical professionals; (ii) sick people honestly report their health problems to those professionals; and (iii) medical professionals record what they are told or observe when examining their patients in as accurate a manner as possible, so that they are aware of enough relevant facts to make appropriate treatment decisions. *Sanchez v. Sec'y of Health & Hum. Servs.*, No. 11-685V, 2013 WL 1880825 at *2 (Fed. Cl. Spec. Mstr. Apr. 10, 2013), *mot. for rev. denied*, 142 Fed. Cl. 247, 251-52 (2019), *vacated on other grounds and remanded*, 809 Fed. Appx. 843 (Fed. Cir. 2020).

Accordingly, if the medical records are clear, consistent, and complete, then they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Hum. Servs.*, No. 03-1585V, 2005 WL 6117475 at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). Indeed, contemporaneous medical records are generally found to be deserving of greater evidentiary weight than oral testimony -- especially where such testimony conflicts with the record evidence. *Cucuras*, 993 F.2d at 1528; *see also Murphy v. Sec'y of Health & Hum. Servs.*, 23 Cl. Ct. 726, 733 (1991), *aff'd per curiam*, 968 F.2d 1226 (Fed. Cir. 1992), *cert. den'd*, *Murphy v. Sullivan*, 506 U.S. 974 (1992) (citing *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 396 (1947) ("[i]t has generally been held that oral testimony which is in conflict with contemporaneous documents is entitled to little evidentiary weight.")).

However, there are situations in which compelling oral testimony may be more persuasive than written records, such as where records are deemed to be incomplete or inaccurate. *Campbell v. Sec'y of Health & Hum. Servs.*, 69 Fed. Cl. 775, 779 (2006) ("like any norm based upon common sense and experience, this rule should not be treated as an absolute and must yield where the factual predicates for its application are weak or lacking"); *Lowrie*, 2005 WL 6117475 at *19 ("[w]ritten records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent") (quoting *Murphy*, 23 Cl. Ct. at 733)). Ultimately, a determination regarding a witness's credibility is needed when determining the weight that such testimony should be afforded. *Andreu*, 569 F.3d at 1379; *Bradley v. Sec'y of Health & Hum. Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

When witness testimony is offered to overcome the presumption of accuracy afforded to contemporaneous medical records, such testimony must be "consistent, clear, cogent and compelling." *Sanchez*, 2013 WL 1880825 at *3 (citing *Blutstein v. Sec'y of Health & Hum. Servs.*, No. 90-2808V, 1998 WL 408611 at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)). In determining the accuracy and completeness of medical records, the Court of Federal Claims has listed four possible

explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *LaLonde v. Sec'y of Health & Hum. Servs.*, 110 Fed. Cl. 184, 203-04 (2013), *aff'd*, 746 F.3d 1334 (Fed. Cir. 2014). In making a determination regarding whether to afford greater weight to contemporaneous medical records or other evidence, such as testimony at hearing, there must be evidence that this decision was the result of a rational determination. *Burns*, 3 F.3d at 417.

**C. Analysis of Expert Testimony**

Establishing a sound and reliable medical theory connecting the vaccine to the injury often requires a petitioner to present expert testimony in support of his or her claim. *Lampe v. Sec'y of Health & Hum. Servs.*, 219 F.3d 1357, 1361 (Fed. Cir. 2000). Vaccine Program expert testimony is usually evaluated according to the factors for analyzing scientific reliability set forth in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 594-96 (1993). *See Cedillo v. Sec'y of Health & Hum. Servs.*, 617 F.3d 1328, 1339 (Fed. Cir. 2010) (*citing Terran v. Sec'y of Health & Hum. Servs.*, 195 F.3d 1302, 1316 (Fed. Cir. 1999). "The *Daubert* factors for analyzing the reliability of testimony are: (1) whether a theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether there is a known or potential rate of error and whether there are standards for controlling the error; and (4) whether the theory or technique enjoys general acceptance within a relevant scientific community." *Terran*, 195 F.3d at 1316 n.2 (citing *Daubert*, 509 U.S. at 592-95).

The *Daubert* factors play a slightly different role in Vaccine Program cases than they do when applied in other federal judicial fora. *Daubert* factors are employed by judges to exclude evidence that is unreliable and potentially confusing to a jury. In Vaccine Program cases, these factors are used in the weighing of the reliability of scientific evidence. *Davis v. Sec'y of Health & Hum. Servs.*, 94 Fed. Cl. 53, 66-67 (2010) ("uniquely in this Circuit, the *Daubert* factors have been employed also as an acceptable evidentiary-gauging tool with respect to persuasiveness of expert testimony already admitted"). The flexible use of the *Daubert* factors to evaluate persuasiveness and reliability of expert testimony has routinely been upheld. *See*, e.g., *Snyder*, 88 Fed. Cl. at 743. In this matter, (as in numerous other Vaccine Program cases), *Daubert* has not been employed at the threshold, to determine what evidence should be admitted, but instead to determine whether expert testimony offered is reliable and/or persuasive.

Respondent frequently offers one or more experts of his own in order to rebut a petitioner's case. Where both sides offer expert testimony, a special master's decision may be "based on the credibility of the experts and the relative persuasiveness of their competing theories." *Broekelschen v. Sec'y of Health & Hum. Servs.*, 618 F.3d 1339, 1347 (Fed. Cir. 2010) (citing *Lampe*, 219 F.3d at 1362). However, nothing requires the acceptance of an expert's conclusion "connected to existing data only by the *ipse dixit* of the expert," especially if "there is simply too great an analytical gap between the data and the opinion proffered." *Snyder*, 88 Fed. Cl. at 743 (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)). A "special master is entitled to require some indicia of reliability to support the assertion of the expert witness." *Moberly*, 592

F.3d at 1324. Weighing the relative persuasiveness of competing expert testimony, based on a particular expert's credibility, is part of the overall reliability analysis to which special masters must subject expert testimony in Vaccine Program cases. *Id.* at 1325-26 ("[a]ssessments as to the reliability of expert testimony often turn on credibility determinations"); *see also Porter v. Sec'y of Health & Hum. Servs.*, 663 F.3d 1242, 1250 (Fed. Cir. 2011) ("this court has unambiguously explained that special masters are expected to consider the credibility of expert witnesses in evaluating petitions for compensation under the Vaccine Act").

### D. Consideration of Medical Literature

Although this decision discusses some but not all of the medical literature in detail, I have reviewed and considered all of the medical records and literature submitted in this matter. *See Moriarty v. Sec'y of Health & Hum. Servs.*, 844 F.3d 1322, 1328 (Fed. Cir. 2016) ("We generally presume that a special master considered the relevant record evidence even though [s]he does not explicitly reference such evidence in h[er] decision."); *Simanski v. Sec'y of Health & Hum. Servs.*, 115 Fed. Cl. 407, 436 (2014) ("[A] Special Master is 'not required to discuss every piece of evidence or testimony in her decision.'") (citation omitted), *aff'd*, 601 F. App'x 982 (Fed. Cir. 2015).

### E. Determination to Resolve Case without a Hearing

The Vaccine Act and Rules contemplate and encourage special masters to decide petitions on the papers where (in the exercise of their discretion) they conclude that doing so will properly and fairly resolve the case. Section 12(d)(2)(D); Vaccine Rule 8(d); *Kreizenbeck v. Sec'y of Health & Hum. Servs.*, 945 F.3d 1362, 1366 (Fed. Cir. 2020) (affirming on appeal). Regardless of the preferences of the parties, hearings are not required in every matter. *Hovey v. Sec'y of Health & Hum. Servs.*, 38 Fed. Cl. 397, 402–03 (1997) (determining that special master acted within his discretion in denying evidentiary hearing).

## V. ANALYSIS

### A. Petitioner Met Her *Prima Facie* Burden of Proof for a Table Flu/GBS Claim.

Petitioner has alleged the Table injury of GBS following flu vaccination. Motion at 1-2. The Vaccine Injury Table includes this injury, so long as the onset of GBS occurs from 3-42 days after vaccination. 42 C.F.R. § 100.3(a)(XIV)(D). The relevant qualifications and aids to interpretation for GBS require the following to be demonstrated:

> (A) Bilateral flaccid limb weakness and decreased or absent deep tendon reflexes in weak limbs;
> (B) A monophasic illness pattern;
> (C) An interval between onset and nadir of weakness between 12 hours and 28 days;
> (D) Subsequent clinical plateau (the clinical plateau leads to either stabilization at the nadir of symptoms, or subsequent improvement

> without significant relapse; however, death may occur without a clinical plateau); and,
> (E) The absence of an identified more likely alternative diagnosis.

*Id.* § 100.3(c)(15)(ii).

All of these elements have been satisfied here, as the parties agree. *See* Response at 6. There is no dispute that Petitioner developed GBS, and that diagnosis was supported by the medical records. *See, e.g.,* Ex. 7 at 4033; Ex. 12 at 32; Ex. 11 at 14. Furthermore, the records indicated that the onset of Petitioner's GBS symptoms was approximately 11 days after the vaccination. When she presented to the ER on November 3, 2017, she stated she developed bilateral leg weakness that morning. Ex. 7 at 5250. Thus, onset of GBS fell squarely within the timeframe set forth by the Table.

**B. Respondent Did Not Preponderantly Prove Petitioner's Condition Was Caused by a "Factor Unrelated" to the Flu Vaccine.**

When a claimant successfully proves a *prima facie* case of causation, he or she will be entitled to compensation unless there is a "preponderance of the evidence that the illness, disability, injury, condition, or death described in the petition is due to factors unrelated to the administration of the vaccine described in the petition." § 300aa-13(a)(1)(B). Under the Act,

> "factors unrelated to the administration of the vaccine" ... may, as documented by the petitioner's evidence or other material in the record, include infection, toxins, trauma (including birth trauma and related anoxia), or metabolic disturbances which have no known relation to the vaccine involved, but which in the particular case are shown to have been the agent or agents principally responsible for causing the petitioner's illness, disability, injury, condition, or death.

§ 300aa-13(a)(2)(B).

Respondent bears the burden of proving a "factor unrelated" caused the injury by a preponderance of the evidence. *Cedillo,* 617 F.3d at 1338. Importantly, the shifted burden of proof on Respondent is greater than the initial burden of proof on Petitioner. *de Bazan,* 539 F.3d 1347, 1351, 1354 (Fed. Cir. 2008); *Stone v. Sec'y of Health & Hum. Servs.*, 95 Fed. Cl. 233, 237 (2010). As Chief Special Master Corcoran has explained:

> While the evidentiary standard applicable under *Althen*, preponderance, also applies even after the burden shifts, governing authority has characterized the burden on Respondent in this context to be "higher"—or, more accurately, not literally congruent with what a petitioner must demonstrate to receive damages, with one additional obligation not placed on claimants.

*White v. Sec'y of Health & Hum. Servs.*, No. 20-1319V, 2023 WL 4204568, *15 (Fed. Cl. Spec. Mstr. June 2, 2023), *mot. for rev. den'd*, 168 Fed. Cl. 660 (2023), *aff'd*, 163 F.4th 1356 (Fed. Cir. 2025). More specifically, while a petitioner is required to demonstrate the vaccine was a "substantial factor" causing his or her injury, Respondent bears the burden of proving an unrelated cause was the *sole* substantial factor. *de Bazan*, 539 F.3d at 1354; *Stone*, 95 Fed. Cl. at 237.

Moreover, "[t]he difference between 'substantial factor' and 'sole substantial factor' is a meaningful one," such that a petitioner is entitled to compensation where the Respondent proves the alternative cause was a "substantial factor," but not the "*sole* substantial factor." *Stone,* 95 F.3d at 237, n.5 (citations omitted). In essence, this means that Respondent is charged with preponderantly proving the vaccine should be excluded as a substantial factor in causing the injury. *See White*, 2023 WL 4204568, at *16 ("[A] finding that the vaccine has been excluded must only cross the 'more likely than not' line, even if Respondent bears this obligation when petitioners never do.").

In assessing the "factor unrelated" argument, special masters have generally relied on "the same mix of evidence and weighing of items of literature versus expert testimony that they encounter when considering Petitioner's obligations." *White*, 2023 WL 4204568, at *16. In *White*, Chief Special Master Corcoran concluded Respondent had met his burden of proving that an *H. influenzae* infection was the sole substantial factor responsible for the petitioner's GBS. *Id.* at *17. For one thing, Respondent had presented data causally linking GBS and infection, including *H. influenzae* infection, as well as medical record evidence demonstrating that the petitioner had a 10-day history of respiratory symptoms preceding onset of GBS, with a later confirmation of infection with *H. influenzae*. *Id.* The petitioner's treating physicians "overwhelmingly associated his GBS with this infection." *Id.* In addition, the "same record also add[ed] heft to the conclusion that the vaccine could likely be *excluded* as causal." *Id.* (emphasis in original). The vaccination was administered nearly five weeks before the petitioner sought treatment for his respiratory symptoms and almost six weeks before the onset of his GBS symptoms. *Id.* at *18-19. Chief Special Master Corcoran stated: "*This medical history is not consistent with the vaccine playing even a contributory role to Petitioner's GBS.*" *Id.* at *18 (emphasis in original).

There are some congruencies between this case and *White*, but the overall record shows the cases are materially distinct.[4] Like the petitioner in *White*, Petitioner here developed a confirmed *H. influenzae* infection, which most likely began before her hospitalization. She received the subject flu vaccination on October 23, 2017. Ex. 1 at 2. When she presented to the hospital on November 3, 2017, she reported a one-week history of a productive cough and a one-day history of vomiting with little oral intake. Ex. 7 at 5250. At the time of her ER examination, she had a depressed oxygen saturation level of 86%. *Id.* at 5251. A chest x-ray done that day showed pulmonary vascular congestion, and a chest CT scan revealed the presence of multifocal ground glass opacities in the lungs. *Id.* at 5256-57. She had an elevated WBC count and elevated neutrophils. *Id.* at 40, 5254. She was immediately started on broad-spectrum antibiotics for presumptive infection. *Id.* at 796, 826, 5413. She ultimately required intubation. *Id.* at 2409. As Dr. Collins persuasively explained, all of these findings signified an ongoing and serious

[4] Special masters are not bound by the prior decisions of other special masters. *See Hanlon v. Sec'y of Health & Hum. Servs.*, 40 Fed. Cl. 625, 630 (1998), *aff'd*, 191 F.3d 1344 (Fed. Cir. 1999).

respiratory infection at the time of admission. First Collins Rep. at 3. On November 4, 2017, a sputum culture was performed, confirming the presence of *H. influenzae* bacteria. Ex. 7 at 216.

Turning to causation, it is well-established that infections generally are associated with GBS, and Dr. Khella did not dispute this. Khella Rep. at 6, n.4; *see also Ju* at 160 (commenting that about two-thirds of GBS patients have a history of an infectious illness about two weeks before the onset of weakness); *Mori* at 2171 (GBS is preceded by respiratory illness in 30-45% of cases); *Nafissi* at 375 ("The results of this study revealed that the history of recent infection, especially respiratory infection, is clearly related to the development of GBS."). Also, as in *White*, this record includes studies supporting an association between *H. influenzae* infection and GBS. *See Ju* at 165-66 (finding an increased incidence of IgG antibodies to nonencapsulated *H. influenzae* in GBS patients compared to controls, though the increase was not statistically significant); *Mori* at 2171 (finding a statistically significant increased incidence of antibodies to nonencapsulated *H. influenzae* in GBS patients compared to controls); *Nafissi* at 376 (finding a significantly increased average IgG titer level for *H. influenzae* in GBS patients compared to controls; the authors acknowledged that, by measuring only IgG levels, they might have overestimated the population of *H. influenzae*-positive patients).

However, the record also contains data showing an association between the flu vaccine and GBS. Dr. Khella submitted the *Juurlink* study, which evaluated about 1,600 GBS patients in Ontario, Canada, finding a statistically significant increased risk of GBS during weeks 2-7 following flu vaccination compared to the control interval. *Juurlink* at 2217. In *Lasky*, the investigators evaluated GBS cases during the 1992-93 and 1993-94 flu vaccination seasons. *Lasky* at 1798. They found that the risk of GBS in the first six weeks after flu vaccination increased by a factor of 1.7. *Id.* at 1800. The peak risk occurred during the second week after vaccination. *Id.* at 1801. *Kwong* evaluated 2,831 GBS cases, finding a relative risk of 1.52 in the six weeks after flu vaccination. *Kwong* at 769. The risk of GBS following an influenza-coded medical visit was higher than after vaccination. *Id.; see also* Frank DeStefano et al., *Principal Controversies in Vaccine Safety in the United States*, CLIN INFECT DIS 1-6 (2019) (Ex. A, Tab 6) ("*DeStefano*") at 1 (review reporting that "[a] possible small increased risk of GBS following influenza vaccination has been identified, but the magnitude of the increase is less than the risk of GBS following influenza infection.").

Dr. Collins argued that *Juurlink* and *Lasky* were uninformative because they did not adjust for flu infections during the periods studied. Second Collins Rep. at 4. She also pointed out that *Kwong* likely underestimated the risk of GBS following flu infections, as it studied only patients who received medical attention and thus did not account for patients with milder infections. *Id.* She cited other studies showing no association between flu vaccination and GBS, with some suggesting a protective effect of vaccination. *See Stowe* at 382 (finding a decreased risk of GBS in the first 90 days after flu vaccination); *Grimaldi-Bensouda* at 326 (finding no significantly increased risk of GBS in the first six weeks after vaccination); *Greene* at e67185 (finding no increased risk of GBS associated with the 2009 and 2010 seasonal flu vaccines, after adjustment for antecedent infection); *Vellozzi* at 696 (finding a lower risk of GBS in H1N1 flu-vaccinated patients than in unvaccinated patients); *Baxter* at 197 (finding no association between any vaccination and GBS). But while these papers, and Dr. Collins's critiques, provide a

counterweight to *Juurlink*, *Lasky*, and *Kwong*, they do not supersede those studies or render them unreliable.

In sum, the record contains evidence supporting both *H. influenzae* infection and flu vaccination as potential causes of GBS. While the weight of the epidemiologic data might demonstrate the association of GBS with flu vaccination is weaker than with infection and/or *H. influenzae* infection, that does not permit the *exclusion* of the flu vaccine as a potential "substantial factor" causing GBS.

Moreover, this case departs from *White* quite starkly when one considers the overall medical histories in question. In *White*, as noted, the petitioner received the subject flu vaccination almost five weeks before the onset of his infectious respiratory symptoms and almost six weeks before the onset of his GBS symptoms. The petitioner's treating physicians uniformly attributed his GBS to his *H. influenzae* infection. By contrast, in this case Petitioner received her flu vaccine only a few days before the onset of her respiratory symptoms and only 11 days before she presented to the hospital with bilateral leg weakness. Ex. 1 at 2; Ex. 7 at 5250. As the vaccination and infection occurred in close temporal proximity to one another, it is far more difficult here to parse out the likely causal factors in Petitioner's GBS. Additionally, unlike in *White*, Petitioner's treating physicians did not attribute her GBS to *H. influenzae* infection. Instead, several of her doctors acknowledged that she received a flu vaccine a few days before her symptoms began, and none attributed her GBS to her respiratory infection. *See* Ex. 3 at 19; Ex. 5 at 3; Ex. 11 at 11; Ex. 12 at 32; Ex. 15 at 3348. Furthermore, as Dr. Collins noted, Petitioner had positive IgG and IgM results for influenza A and B during her hospitalization. First Collins Rep. at 3-4; Ex. 7 at 278. In her view, these results indicated remote exposure consistent with the flu vaccination she received on October 23, 2017. *Id.* Thus, the continued presence of these antibodies is consistent with Petitioner having an ongoing immune response to the vaccination at the time her GBS developed. This, too, pulls against excluding the vaccine as a substantial factor.

Regarding timing, as noted, the onset of Petitioner's neurological symptoms was about one week after the onset of her cough and 11 days after the vaccination. Both of these timeframes are consistent with periods of increased risk of GBS. *See*, *e.g.*, *Kwong* at 773 (reporting the greatest increased risk of GBS in weeks 2-4 after flu vaccination and in the first week after a healthcare encounter for an influenza-like illness).

In sum, I conclude that Respondent did not preponderantly demonstrate an *H. influenzae* infection was the sole substantial factor causing Petitioner's GBS. As such, Petitioner is entitled to compensation.

## VI. <u>CONCLUSION</u>

Upon careful evaluation of all the evidence submitted in this matter, including the medical records, the experts' opinions, and the medical literature, I conclude that Petitioner has shown by preponderant evidence that she is entitled to compensation under the Vaccine Act. **Her petition is therefore GRANTED.** An order regarding damages will issue shortly.

**IT IS SO ORDERED.**

**s/ Jennifer A. Shah**
Jennifer A. Shah
Special Master